Good morning. Good morning, Your Honors. Mr. Yunt. May it please the Court. My name is Scott Yunt, and I represent Appellees Tri-Valley Cares, Mary Leah Kelly, and Janice Kate Turner. At my counsel table is my co-counsel, Steven Sugarman, from New Mexico. I'm planning to reserve about three minutes for rebuttal, Your Honors. This case is about the United States Department of Energy, a federal agency's failure to implement the procedural requirements of the National Environmental Policy Act. This case is not about scientific uncertainty, and it's not about competing scientific evidence. It's about a federal agency failing to implement procedures that are at the heart of this statute, failures that amount to an error of agency judgment and that this Court can provide relief for and protect the important public interests that are at heart. This Biosafety Level 3, or as I'll refer to it, the BSL-3 facility, will be doing experiments on select agents, which are those that are necessarily involved in bioweapons and have a high security risk. These agents will be genetically modified at the facility in order to increase their virulence, and this will all be done a half-mile away from densely populated neighborhoods in Livermore, California. When this Court took a look at the original environmental assessment back in 2006, they determined that it was inadequate for its failure to analyze the potential impacts that a terrorist act on this facility might have. On remand, the agency produced a revised environmental assessment. Unfortunately, it did not follow the procedural requirements of NEPA and did not meet this Court's order. In the Court's most recent – Well, wait just a minute. Just to kind of narrow the scope of what we're talking about. Yes. Our Court's order basically approved everything they'd done except the issue of the terrorism analysis. Correct. And what they said, and I have it in front of me here, they said, similarly, we remand for the DOE to consider whether the threat of terrorist activities necessitates the preparation of an environmental impact statement. As in Mothers for Peace, we caution that there remain open to the agency a wide variety of actions it may take on the remand, and we do not prejudge those alternatives. So we're focused here exclusively on whether they dealt appropriately with the terrorist threat. That is correct, Your Honor. And they approached it, three little tranches they took. They basically assumed that once these – what shall I call them? Credible terrorist events? No, no. I'm talking about escape. What shall I call them? Bioagents. Bioagents. That if they escaped, that the net effect of the escape would be what they had already analyzed based on however they got out there. That's basically what they did. Yes. So as I understand it, your point is that they did not consider every possibility as to how they would get out, not what would happen once they got out. Do I understand your position correctly? Well, I want to give you some nuances. Okay. Because they analyzed – they said that there was a bounding accident scenario here, but they said that bounding accident scenario was only for one of the credible potential terrorist acts, and that is an act that breaches containment of the facility. Okay. But just, again, we're not scientists. Yes. But I just want to be sure I'm understanding you correctly. Yes. They had previously analyzed the effect of the bioagents getting out by other means. Yeah, and that's – Our court said they did all they needed to do on that. So now the question is, are there aspects of a terrorist threat that changed the scenario? They have one like the equivalent of an airplane crash into it. Then they've got an internal person, they've got an outside person. But the reality is the bioagents escape. And they're saying that however they get out, we've already analyzed that. And do you believe that – assuming they get out, that they have properly analyzed the effect of that, are you disputing that as well? I'm disputing whether or not the scenario that they claim to have analyzed, which was from the original EA, they really do no new analysis in this one. They just fit the intentional terrorist act into that original analysis. Now, is there anything wrong with that? Can you cite any case law that suggests that if – assuming that, in this case, our court did say that was okay based upon what they'd heard to that point, that they cannot say, okay, if the agents get out, that the effect would be the same. It doesn't matter how they get out. They get out. Well, here I'd like to point you to the Department of Energy's own agency guidance that was issued by the headquarters office of NEPA and policy – of NEPA policy. And this was a direction in response to this court's 2006 order. That's – you know, it's not some vague guidance. It's in response to this court saying that they are – if you're going to do a bounding accident, it needs to have similar initiating factors to an intentional terrorist act in order to meet the hard look that NEPA requires. What they were recognizing is that there is a difference in the potential impacts of a scenario, of an accident scenario, that doesn't involve initiating factors that are similar to what an intentional actor would do. And here the accident is – But help me understand this because – I will. The – NEPA is supposed to – it's a dialogue, basically. Correct. If there's an environmental impact, the agency has to analyze what the potential impact of its action will be. The public then has the opportunity to comment. They then respond. And ultimately, there's a disclosure that is sufficient for action to take place or not take place based upon what is known. Yes. So in this case, they've done a whole lot of this. Our court said that once the agents get out, it looks like they've adequately disclosed and analyzed this. You, of course, didn't agree with them, but we never have agreement in these kinds of cases. The question is whether it's adequately disclosed. So in this case, I've got these three scenarios that they've come up with. Yes. And what I would appreciate your helping me with and our colleagues – Yes. – is in what specific way was the analysis that they did different in terms of how it would change what happens to the agents once they get out than the global analysis that occurred before about what happens when the agents get out? Am I being clear? I don't know. I think so. But I want to get back to this idea just of there being three. Okay. Analyses that they made because for two of those, which are the impacts from insider or outsider after theft and subsequent release, they actually don't use that bounding scenario, and instead they say that the probability of those events is so low because of other factors that they don't require analysis. Well, that in and of itself is an analysis, isn't it, whether you agree with it or not? I don't think that's the hard-look analysis that NEPA requires of environmental impacts because to analyze whether or not something has factors that change those impacts to a level of significance that is insignificant, you need to first determine what those impacts actually are. And they didn't do a determination of what the impacts of those two credible terrorist acts would be. But, again, my understanding is that they did do that in the sense that they said, if you look at these criteria, it just doesn't have an impact. You know, it's so small, it doesn't really have an impact. Now, maybe I'm misreading it, but the fact is that is an analysis, it's a determination. Again, I understand you don't agree with that. Well, it's not that I don't agree, Your Honor. It's that it doesn't meet the procedural requirements of NEPA. And, in fact, they even admit in those two sections about theft and release that if there was a successful theft and release, it would have potentially catastrophic impacts. And then they go on to not analyze those impacts or determine what they actually are besides saying that they're catastrophic. They didn't say that if they were released, you would go to this cabined approach before. In other words, the analysis that previously took place about what happens if the agents are released into the environment. Yes. They do not say that, Your Honor. That scenario is only bounding of what they say is a threat of breach of containment of the facility, so one in which there's a hole in the facility. Again, I'm not a scientist, but help me with this. I will help you because there are three separate scenarios, right, two in which they steal and release them elsewhere. Okay. That's just unanalyzed. It's not the same as if bio agents escaped at the facility. That one's going to have different consequences, consequences that happen in the environment potentially elsewhere that are just not analyzed at all because they say that this potential significance of those is essentially mitigated or there's other factors that make it so improbable. It's basically de minimis is what they're saying, right? They're saying it's improbable. And that is already in violation of this court's order that they do an analysis and the holding in Mothers for Peace in which the court said that NEPA's requirements apply to events that are potentially catastrophic, which they admit that those events would be, even if their probability of occurrence is low. And that court went on to say that the rule of reasonableness that governs NEPA's applicability shows that the possibility of a terrorist attack is not so remote and highly speculative as to not require analysis. Okay. I don't know whether you want to save the balance of your time or whatever you want to do. Do you want to go forward at this point or do you want to save some time? I will go forward at this point because I want to direct the court's attention to the Ninth Circuit's most recent pronouncement on NEPA, the Northern Plains versus Surface Transportation Board. I'm familiar with that case. Yes, I know you are. I think that it really reaffirms the essential procedural nature of the National Environmental Policy Act, which, again, is, one, to ensure that federal agencies take the requisite hard look at environmental consequences, which wasn't done here for those two potentially significant pathways. And, two, if you know, in that case, we went through and analyzed and there were many instances where they didn't do that. What I'm struggling with here is, I think you can tell, I don't have a problem with following where the law goes. It's not an issue here. Yes. But I'm just struggling with the fact that, in this case, the government did a whole lot of analysis. It didn't do all that you're asking it to do. The question is, at what point is it enough? I suspect, with attorneys as bright as you are and your colleagues, that this could be something that would continue indefinitely. I disagree. It would always, always be enough. I hear what you're saying. It would have been enough had they actually analyzed a terrorist-specific accident, which they did in the Mothers for Peace case, and the Court affirmed that that was significant enough. That was enough. Here, it would have been enough had they do that. And I want to just bring the Court's attention really quickly to my other point, which is that they also fail to disclose very important information regarding a 2005 release of anthrax that exposed five workers. I thought they didn't talk about that. They don't talk about it in the draft. They say there was a shipping incident that resulted in violation of select agent handling regulations. But it was that incident, was it not? It was that incident. They don't mention very important facts, including that it was anthrax, including that it actually exposed people, including that they were fined for the violation, and including that they broke their own safety and security procedures in doing that. Those are key facts that had significant bearing on whether or not that issue was potentially elevating the significance of this facility to the level of significance requiring an EIS. And all of that information was withheld by an individual employee, and that is not okay under the standards of NEPA. A hard look requires agency expertise and data be gathered and analyzed, and this one individual employee made the decision that that incident was insignificant and to not include it. So I'm going to save the rest of my time. Okay. Very good. We'll hear from the government. Thank you. May it please the Court, Clay Sanford on behalf of the Department of Energy. As Judge Smith has correctly identified, the sole issue before this Court on the review of the NEPA document today is the adequacy of the analysis of terrorism prepared for the remand, and then the analysis of events that occurred between the last EA and the revised EA. And I'd like to focus first on the terrorist attack scenarios, and then if we have time I'll talk about the supplemental information claims. As the Court has identified, the DOE analyzed three separate terrorist attack scenarios. The first was a direct breach, if you will, of the facility caused by a catastrophic event, such as a plane crash or a bomb. The second two events were theft events. The first by an outside terrorist stealing a pathogen and then later releasing it, and the third is a theft by an insider with malicious intent. Because all three of those have different – they follow different routes, the DOE analyzed them separately. With regard to a direct terrorist attack, the DOE relied upon what they call a maximum credible event scenario. This scenario was developed, as the Court identified, during the first EA. In developing this scenario, the DOE considered a range of events, accidental plane crashes, earthquakes, fires, and determined that because of the sort of unique nature of the pathogens here, unlike a radiation event where radiation would be spread everywhere, these pathogens are killed by fire, they're killed by exposure to light, they're killed by heat. And so the DOE determined, as the Army had before them, that these pathogens, the impacts of an accidental plane crash, something that caused a fire, would be less than the impacts of this credible event scenario based on an accident with a centrifuge where the Q fever agent is aerosolized and passes outside of the building after an accidental aerosolization. The – this Court, of course, upheld that analysis during the first permutation of this case, and on remand, DOE considered whether that event was still bounding of a purposeful direct catastrophic attack. Our court on remand did not cabin the particulars of the DOE's analysis, did it? It did not, Your Honor. As you've pointed out, the remand is very deferential to the agency's expertise, as was the remand in the Mothers for Peace case that preceded it. DOE – and according to DOE guidance, you can use an accidental event to bound a purposeful malicious event so long as you explicitly explain in the document why that – why you've made those assumptions, why it's reasonable to use an accident to bound a purposeful event. And here in the EA, the DOE explained that for several reasons, a purposeful plane crash would have the same effects as an accidental plane crash, and that would still be bounded by this accident scenario. In large part, that's because this facility operates with very small amounts of pathogens at a time. So when a lab technician is working with a pathogen, they're using very small amounts, putting it in a Petri dish, putting it under a microscope. And so in the event of an attack, the amount of a pathogen that could be released is very small. If I understand correctly, the Tri-Valley folks are not so concerned about the analysis in the plane crash, but rather in the other two scenarios. And if I understand their concern, it is that whereas the plane crash, you've got a locus of where this is going to occur. On the other hand, if there's theft, you don't know where it's going to go. They could take it anywhere. I don't want to understand it correctly, but if that's correct, why does the analysis that the Department did on this meet the standards of NEPA? Let's turn to those scenarios, Your Honor. Okay. Dealing first with the outsider event, the NEPA, of course, requires the agency to consider the incremental impact of its action against a baseline, against the no-action alternative. In this case, it turns out that there's well over 1,000 BSL-3 labs in this country that deal with pathogens that are no different than the ones being dealt with by the DOE here. So the NEPA analysis proceeds along very standard lines. There's little difference between no action and action. Adding one more facility to the background of 1,000 doesn't appreciably or significantly change the availability of pathogens. This is just kind of a de minimis, non-curate lex approach. Is that what it is? Yeah, no change of our baseline, Your Honor. This Court's status quo cases make clear that if you don't change the status quo, the environmental status quo, that there's no significant impact to disclose under NEPA. Now, plaintiffs have criticized this approach, saying, well, you should have restricted the analysis to the Livermore area. You should have looked at the fact that there's now a facility in Livermore and there may not have been one previously. And I think that this Court's case law, in fact, the Surface Transportation Board case that plaintiffs are talking about, show that you can look at different scales of impacts. For example, noise may be a very localized impact. Look at within 300 yards of a railroad right away. In this case, there's no evidence that a terrorist impact is any more likely in Livermore than elsewhere in the country. There's no evidence that a terrorist is more likely to release pathogens near where they steal them. So therefore, the DOE reasonably concluded that the threat is nationwide, and therefore the background, the scope of analysis for this sort of event should be nationwide. And I would submit that that's a well-reasoned, hard-look analysis, Your Honor. And from the government's perspective, I gather you believe that it fully meets and addresses in a rational way each of the material complaints, if you will, that the Tri-Valley folks make. I believe it does, Your Honor. I believe that this agency has worked hard to, obviously, knowing it was going to come back again on remand, to address the concerns of the Court and the plaintiffs. The third scenario was the insider theft event, and that's warranted a sort of separate and different analysis from the outsider theft event. And for the insider theft event, the DOE pursued two separate inquiries. The first was, what's the probability of an insider, of there being an insider with malicious intent? Someone has to be in the facility who wants to do this. And the second was, assuming that there is that insider and assuming they steal. And that was, in fact, the situation with the anthrax scare in 2001, yes? Your Honor, I'm actually not sure. I understand that there is an FBI conclusion that an individual was an insider. But they would have, what they said is that they had proved beyond a reasonable doubt and they would have charged him, but for the fact that he committed suicide, when he was informed he was about to be charged. And as I stand before you, Your Honor, I have no information that would suggest that's correct or incorrect. I think that... Well, excuse me. Are there two governments here? That was the statement approved not just by the FBI, but by the Department of Justice of the United States. You're not bound by that conclusion? I'm bound by it, Your Honor. I think that what distinguishes this analysis is that there's no evidence in the record that would suggest that the human reliability control systems that are in place at Livermore are the same as those that were in place at the Army's facility where, allegedly, the anthrax was removed. And so on the first point... So your argument in response to Judge Rakoff's point is that whatever happened there, you've got different security, different approaches in the Livermore proposed lab than over there. This facility has... That's correct, Your Honor. This facility has procedures that were developed, and this is where almost six years, seven years out, a decade out, I guess now, from where, from those, that incident. I think the second, two more points on that, if I may, Your Honor. The first is that there's this record makes very clear that this facility does not work with the sort of dry, spore, weaponized anthrax that was involved in those mailing incidents. No, it wasn't weaponized. It was not weaponized. The spore form of the anthrax that was used in... It was not weaponized. My understanding... It's not weaponized. This is neither here nor there because it's not part of the record of the case, but I served on the National Academy of Science committee that analyzed this at great length over a period of three years. I assure you it was not weaponized. I stand corrected in what we said earlier. We do have a scientist on the panel. Your Honor, if I may, the pathogens involved in this lab, as the record makes very clear, are used in small amounts contained in a form that, under the DOE's analysis, would have to be removed and then grown elsewhere in order to make them a viable weapon. So the two-part analysis pursued for an insider theft event is, one, the likelihood of there being a malicious insider, and in that analysis we rely on two things. The first is there are very robust human reliability programs in place, and, number two, that there's ten or fewer employees who have access to select agents. So there's a very small set of individuals who we have to worry about here. The second part of the analysis, though, proceeds to assume there is a theft event, and it pursues an analysis, a qualitative analysis, of the most likely results of that theft event. And what the DOE says is anything, any theft of more than a minute amount of the substance is going to be noticed quickly because of the inventorying that takes place. And so the most likely route of a theft would be to take it out and attempt to grow it and cultivate it and weaponize it or aerosolize it elsewhere, such that it's very hard, in DOE's estimation, and the same with the Army's estimation, for an individual to pull that off, to have the technical capacity to pull that off. And so coupling these two events together, these two lines of analysis, the likelihood of a malicious insider, as well as the likelihood of a successful theft and attack event, the DOE determines there's not a significant risk of this occurring. So that Does NEPA require the DOE to conjure every conceivable possibility of a terrorist event or just the most likely or those perhaps that are raised by, in this case, Tri-Valley or others in their comments that require, that are material that require a response? Yes, Your Honor. I think the standards are reasonably foreseeable events, and we know that the DOE is not required to either speculate nor is it required to create worst-case scenarios. So we're looking at, A, highly improbable events, but of those highly improbable events, we're trying to figure out what the most likely, the most reasonable route would be. And pursuing that analysis on three levels, I would submit to the Court that the DOE has taken the requisite hard look required by NEPA. If I could turn briefly to the issue of the 2005 shipping incident that involved anthrax bacteria. This situation, there was a situation where a collection of anthrax was being shipped from the Livermore facility to two other laboratories. The shipping was being handled by a former employee and former professor who was the principal investigator, sort of the holder of this collection of anthrax. A handful of these vials arrived at the laboratory. They were received with uncapped or with loose caps such that the agent had leaked out into the interior packaging but not into the fully outside of the containers. This resulted in investigations by CDC, by the Department of Transportation, by the Department of Energy itself, and ultimately the DOE and the other agencies, DOE improved some of its procedures and the other agencies concluded that resumption of work with these agents could continue. This event was described in the draft EA. Plaintiffs commented on the description at length in their public comment letters. And then the DOE changed and increased the description in the final analysis. The first EA, for example, in the district court, the plaintiffs made an allegation of bad faith, which they have not pursued here. And in response to that allegation of bad faith, we presented evidence to the district court as to why the description in the first, in the draft document, wasn't as robust as the description in the second one, particularly why the agent wasn't identified. So the DOE, of course, as I understand it, initially talked about this in the DREA. There were comments that came from Tri-Valley and perhaps others. The government then responded by adding an additional discussion. Is that correct? That's absolutely correct, Your Honor. And I would submit to the court that while that discussion is not as robust as plaintiffs believe it should be, it complies with NEPA. In particular, it's consummate with the level of the analysis or consummate with the significance of the impact on the overall shipping analysis. The shipping analysis in this document looks at the safe shipping history of tons of infectious waste over hundreds of thousands of shipments and determines that the amount of shipping from this facility is not going to significantly impact that. Correspondingly, the one incident here does not change that analysis, does not shift it to a significant impact. I guess from my perspective and understanding of NEPA, it is the fact that the comment, you addressed it. They made the comments. There was you engaged. You talked about the issue. Whether it was sufficient is something we obviously need to consider. But the reality is there was no apparent attempt by the DOE to evade discussion of what was obviously a material issue. I think Your Honor used the word dialogue, and that's what has happened here. And while one side of that dialogue remains dissatisfied, I think it does satisfy the arbitrary capricious standard of NEPA. With that, Your Honor, I will confess. Okay. I was going to suggest you all go into marriage counseling, but I'm not going to. Please, we'll have the rebuttal. First off, Your Honors, if I may, I just want to say there really was not a dialogue about an anthrax incident. There was a slight dialogue about shipping procedures because that section appeared in the transportation area of the EA, not in the terrorist section. It had a clear bearing on the terrorism section, which was the focus of the remand here. And we were not able to comment on how it related to a terrorist act. We weren't able to comment on the terrorist act. Let me be sure I understand. You're saying it was in the wrong section of the FRAA? It was appropriately put in the transportation section and should have also been mentioned and talked about in the terrorism section. Does that make it fatally defective that it's in the wrong part of the FRAA? Well, because this Court's inquiry was about terrorism and the focus of our comments was about terrorism, there was not an understanding that this event had a potential significance as to the terrorist impacts until we received more information from another agency in the government once the Department of Energy was fined. And just because they put more information in the final did not assist the public process in any way because we weren't able to comment on the final. Because it was in the wrong place? Yes. I think in the final they may have referred to it. I think it stays in the transportation section. But let me also just mention that there are significant differences of this BSL-3 facility and the 1,300 others. This is the only Department of Energy BSL-3 facility. It's the only BSL-3 biolab inside a nuclear weapons laboratory. It's a federal lab. Most of the others are in hospitals and universities. There are not many government-run BSL-3 labs in the country doing the kind of work that this is for national security purposes, and that necessarily heightens the potential terrorist risk. And as I said, on one hand they can't deny a terrorist risk, where on the other hand they prepare for it. And I also just want to say that the analysis to minimize was an analysis of probability here, and NEPA required an analysis of impacts. So thank you. Very good. Thank you, counsel, both sides, for their able argument. This is an important matter, and we will get to it promptly. The matter of Tri-Valley Cares v. U.S. Department of Energy is submitted, and the Court is adjourned for the day.
judges: Rakoff, Noonan, Smith